Theodosia Matlack *v.* The Mutual Life Insurance Company of New York and The Seventh National Bank of Philadelphia, Appellants.

[Marked to be reported.]

*Insurance—Life insurance—Accumulated dividends—Forfeiture.*

Where there were accumulated dividends on a policy of life insurance, the cash value of which was sufficient to pay premiums due, and such dividends had in the years immediately preceding, at the request of the beneficiary been applied to the payment of premiums as they became due, the insurance company had no authority to forfeit the policy for the nonpayment of the premiums.

*Insurance—Life insurance—Assignment—Forfeiture.*

A bill in equity was filed against a bank and an insurance company to compel them to account for the proceeds of a policy of life insurance. The plaintiff was the widow of the assured who died a few months before the bill was filed. The evidence showed that twenty-four years prior to the filing of the bill, the assured who was insolvent owed the bank on a promissory note. His wife held a policy of life insurance on his life, and this she assigned to the bank as security for her husband's debt. The wife testified that she was constrained by threats to make this assignment, but there was no evidence that the bank or the insurance company had knowledge of any such fraud. It turned out that under the laws of the state of which the insurance company was a citizen a policy to a married woman was not assignable. The bank returned the policy. When the next quarterly premium on the policy fell due it was not paid, and the policy was forfeited, although there were accumulated dividends sufficient to pay the premium. A new policy was issued for the same amount, bearing the same number, and at the same rate of premium as the first, and was in part purchased by the use of the reversionary insurance that stood to the credit of the first policy. It was issued to the executors, administrators or assigns of the assured, and was by him assigned to the bank. The bank paid the premiums on the second policy until the death of the insured. After the death of the insured, the insurance company paid over the amount of the policy to the bank, with knowledge of plaintiff's claim. *Held*, (1) that the insurance company had no right to forfeit the first policy; (2) that the second policy was a substitute for the first policy, and having been received by the bank with knowledge of that fact, it was impressed with a trust in favor of the plaintiff; (3) that the bank was entitled to credit for the payments; (4) that a decree should be entered against both defendants for the amount due upon the policies, less the premiums paid by the bank, and the costs of the suit should be borne equally by the plaintiff and the defendants; (5) that the plaintiff's right to recover is based solely upon

the fact that the insurance company had no right to forfeit the policy, and not upon the alleged fraud in securing from her the assignment.

WILLIAMS and MITCHELL JJ. dissented on the grounds (1) that the plaintiff was an incompetent witness; (2) that she was barred by laches; (3) that on the merits the bank was entitled to the whole of the fund.

Argued Jan. 5, 1897. Appeal, No. 259, Jan. T., 1896, by defendants, from decree of C. P. No. 4, Phila. Co., March T., 1893, No. 1063, on bill in equity. Before STERRETT, C. J., GREEN, WILLIAMS, McCOLLUM, MITCHELL, DEAN and FELL, JJ. Affirmed. WILLIAMS and MITCHELL, JJ., dissent.

Bill in equity to compel the payment of the proceeds of a policy of life insurance.

The case was referred to Hampton L. Carson, Esq., as master, who reported as follows:

### FINDING OF FACTS.

On April 16, 1862, an application was made to the Mutual Life Insurance Company of New York by George D. G. Matlack, in the name of Theodosia Matlack, his wife, for a policy of life insurance in the amount of $5,000, to be issued upon his own life in favor of his said wife. By memorandum written on the face of the application the policy was to be dated April 18, 1862. On the back of the application there was printed in plain type an act of the state of New York, passed March, 1858, " for the benefit of married women in insuring the lives of their husbands," by which, in case of the death of the husband and the survival of the wife, " the sum or net amount of the insurance becoming due and payable by the terms of the insurance shall be payable to her, to and for her own use, free from the claim of the representatives of her husband or any of his creditors;" such exemption, however, not applying where the amount of the annual premium paid out of the funds or property of the husband should exceed $300. The amount of the premium stipulated for was the sum of $29.55 in each quarter, or the sum of $118.20 a year.

Policy No. 26,717 was duly issued by the company, in accordance with the application, upon the life of George D. G. Matlack for $5,000 in favor of Theodosia Matlack, his wife, dated April 18, 1862. The policy was handed by her husband to

Mrs. Matlack, who retained possession of it, with the premium receipts. Premiums were paid in full up to April 18, 1869, the last payment on this identical policy being made on the 18th of January, A. D. 1869, which carried it to the first-named date. During the years 1867 and 1868 the dividends were employed in the payment of the premiums. Reversionary dividends and an additional dividend, commonly called an "adjustment," were from time to time declared, of which there were various surrenders, the net result of which was that at the anniversary of the policy in 1868 there was a total of $638.13 credited to the policy. During that year there were two surrenders of dividends, amounting to a total of $351.78, which, being taken from the former sum, left a balance of $286.38 reversionary dividend, which was carried over to the anniversary of the policy on April 18, 1869. This had a value in cash of $107.58. According to the books in the possession of the Philadelphia agent of the insurance company the policy was entitled to $373.90 in reversionary dividends in April, 1869. This had a cash value of $140.49.

On January 28, 1869, George D. G. Matlack became indebted to the Seventh National Bank through the discount of a note in the sum of $1,278.83, and on February 19, 1869, a second note was discounted for $500, making a total indebtedness of George D. G. Matlack to the bank, on the latter date, of $1,778.85. On December 5, 1868, the bank had become a holder of a paid-up policy of life insurance, issued by the Mutual Life Insurance Company of New York, No. 90,331, for $350 on the life of George D. G. Matlack, in which Theodosia Matlack had no interest. On February 16, 1869, after the discount of the first note and before the discount of the second note by the bank, George D. G. Matlack, by threats to take his own life and coercion, obtained the signature of his wife to an assignment in writing of policy No. 26,717 to the Seventh National Bank, dated eo die, and witnessed by one Benjamin Butler. The witness was informed that Mrs. Matlack signed the written assignment unwillingly, and that Mr. Matlack had taken the policy from its hiding place where Mrs. Matlack had secreted it. Of these facts neither the bank nor the insurance company had knowledge. A rule of the company, then in force, provided that policies issued to married women on the lives of their husbands

are not assignable. The assignment, though taken away by Mr. Matlack, was not delivered to the bank, and was produced from the custody of the plaintiff, who obtained it from her husband in 1888, when he was conducting some fruitless negotiations with the bank for the transfer of his life insurance papers. The receipts for premiums in former years were also taken possession of by Mr. Matlack shortly after he secured the assignment. On April 14, 1869, the cashier of the bank wrote to Mr. Matlack as follows: " The insurance policy matter is to be arranged on or before the 18th inst. Please call at the bank in time to complete the arrangement." And again on April 17, 1869, he wrote: " The premium on policy is due to-day. Call at the bank on Monday by 10 A. M. without fail, so that the matter can be arranged according to agreement."

On April 22, 1869, another policy (physically speaking) was issued by the Mutual Life Insurance Company of New York, No. 26,717 (being the same number as the former policy), for the sum of $5,000 on the life of George D. G. Matlack, payable to his executors, administrators, or assigns, for the same quarterly premium, maturing on the same days as in the former policy (18th days of April, July, October and January), and issued without any medical re-examination of the insured. Seven years had elapsed since the medical examination on which the first policy was based. The old policy of the same number in favor of Mrs. Matlack, was surrendered to the company and declared lapsed, with the endorsement on it, " to own favor, having lapsed April 22, 1869." The reversionary dividends credited to the policy lapsed with the policy, but were subsequently used in the payment of premiums on the substituted policy. The substituted policy had endorsed upon it " Premium on former policy same number, paid in full to April 18, 1869." On April 24, 1869, the substituted policy was assigned by Mr. Matlack to the Seventh National Bank, Benjamin Butler again acting as a witness. On the same day the transfer was entered at the office of the insurance company. The premium was paid April 26, 1869, by the check of the cashier of the bank and charged to Mr. Matlack's account. Of the preceding facts the plaintiff had no notice until December, 1888, when she learned what had taken place from her husband. She was not notified by the insurance company of the lapse of

the policy nor of the issue of a new one, nor was she ever called on for premiums. The subsequent premiums as they matured were paid by the bank, partly in cash and partly by the application of annual dividends credited to the policy, until the death of Mr. Matlack on January 19, 1893. In 1869 the reversionary dividends were $373.90; dividend, $141.29; cash, $48.46; amount used July and October, $59.10. The total amount of premiums paid by the bank was $1,574.58, and the total amount of dividends applied to the payment of premiums was $1,262.22.

In the deposit book of Mr. Matlack with the Seventh National Bank, written by himself, occur the following statements:—

"PHILADELPHIA, February 16, 1869.

"Transferred policy 26,717 in favor, February, 1869, Theodosia Matlack, 16, $5,750, my wife, amount of policy including dividends. The bank allowed this policy to lapse only for a few minutes, as I was in the examiner's room all prepared to have the company issue a new policy in the bank's favor for $5,000. The Insurance Company issued a new policy on my life in the Seventh National Bank's favor for $5,000.

"GEORGE D. G. MATLACK."

And on a preceding page:

"PHILADELPHIA, August 6, 1888.

"I this day called at the office of the Mutual Life Insurance Company of New York and was informed that policies on my life in their company, No. 26,717 for $5,000 and No. 90,313, $358, paid up, were in full force.

"GEORGE D. G. MATLACK,
"2439 N. Fifteenth Street."

There was no evidence to show when these statements were written, nor were they ever made known to either the bank or the Insurance Company.

Shortly after the death of her husband, Mrs. Matlack, on February 4, 1893, subscribed and swore to a claim against the Insurance Company upon one of the company's blanks, describing the policy by number, date, and amount. She was not in possession of the policy, nor had she ever paid or tendered any of the premiums. Proof was made in the usual manner of the death by the production of the doctor's and undertaker's certi-

ficate, although these latter were not on the company's blanks. The claim was resisted by the company on the ground that the policy No. 26,717 in favor of Theodosia Matlack had lapsed on April 18, 1869, twenty years before, for nonpayment of premium due that day. With full notice of the plaintiff's claim, payment was made of the substituted policy, No. 26,717, to the Seventh National Bank on March 16, 1893, and a bond of indemnity taken from the bank by the insurance company. Thereupon the present bill was filed, in June, 1893, and later an amended bill.

### OPINION.

Upon these facts several questions of law arise, with which the master will deal in their order.

1. The first arises upon the special plea in bar, filed in behalf of the defendant bank, that as to the relief sought by the bill in asking a decree that the so-called assignment of the said substituted policy, No. 26,717, upon the life of the said George D. G. Matlack to the Seventh National Bank be declared illegal, null, and void, inasmuch as it appeared by the bill that the alleged threats, coercion, and conspiracy occurred in April, 1869, and if true were then wholly within the knowledge of complainant, and inasmuch as the complainant had delayed for a period of over twenty-four years in avoiding or setting aside the surrender, forfeiture, and issue of the policy, her laches was pleaded in bar. In the judgment of the master this plea is bad. It must be borne in mind that in April, 1869, the complainant was a married woman, and remained so until January, 1893. The third section of the act of 1713 explicitly provides that several classes of persons, among others married women, are not barred by the statute of limitations until six years after the recovery of their ability to sue. This statutory exemption has never been repealed either expressly or by implication. The point has been conclusively settled in the case of Etter *v.* Greenawalt, 98 Pa. 422, and further citation of authority is unnecessary. It may be said, however, that the same view is taken by Wood in his work on Limitations, sec. 240. No enabling or enlarging act, neither the act of 1848 nor the act of 1887, can operate as a repeal. In those states in which married women are exempted from the operation of the statute, the circumstance that they

are also clothed with the power of suing is not sufficient to change the rule or deprive them of the benefits of the disability. The fact that the legislature has clothed them with the right to sue, and has failed to change the statute of limitations in this respect, indicates clearly an intention on the part of the legislature to leave married women within the exception. Besides this, no right of action accrued to the complainant against the insurance company until after her husband's death. This results from the nature of a policy of life insurance, where the rights of the holder or beneficiary are inchoate and contingent until the death of the insured and the performance of conditions during the life of the policy. Had she protested at the time, her protests would have been legally unavailing. She was without the right to speak, because she was without the right to sue, and until she had a complete right of action she could not be in default. The principle is established in the case of Winters v. De Turk, 133 Pa. 359, where it was held in relation to an action of dower that the right of entry to enforce dower did not accrue until after the death of the husband, and that the statute of limitations began to run only from the time when the right of action accrued. The master overrules the plea.

2. The second question which was raised concerns the competency of the plaintiff as a witness. Her testimony was objected to, because the policy on which the bank made claim was one that was apparently of the estate of her husband, and hence she was incompetent to testify against his interests, he being dead. Undoubtedly, at common law, the general rule was that neither husband nor wife could testify either for or against each other. Under the act of 1869, while no interest or policy of law could exclude a witness, yet a wife, while competent to testify for her husband, was expressly incompetent to testify against him. It was also provided that the act should not apply to actions by or against executors, or where the assignor of the thing in action was dead. Hence her competency to testify in favor of her husband was stricken down in actions of this class. Under the act of 1887 it has been held, on account of the identity of interest of husband and wife, that when one of them is incompetent to testify as a witness, the other is also incompetent: Bitner v. Boone, 128 Pa. 567. It is clear that there are two cases of exclusion,—first, where the husband is a party, and,

second, where either husband or wife is interested in the event of the suit, there the other cannot testify adversely. The instances of identity of interest need not be here considered. It must be observed that there is no suit here against the husband, nor the husband's estate; his executors or administrators are not parties; the wife is *discoverte*. She is called on to testify in a suit brought by herself against strangers in the effort to recover property which she claims as her own. The mere circumstance that a policy produced by one of the defendants, as a substitute for the one which she claims as her own, appears on its face to be a part of the husband's estate, cannot render her incompetent when the controversy turns upon the very point whether the substituted policy was not fraudulently substituted for the policy on which she claims, which on its face was her own property, and which she contends is still so. The master overrules the objection and admits the testimony of the plaintiff.

3. Are the written statements in the bank deposit book, made by Mr. Matlack and containing an historical narrative of what had taken place, admissible in evidence? They were made in the absence of all of the parties to this suit, and are purely ex parte, but were offered on the ground that they were declarations against interest. The master is not of this opinion. It is not clear what the interest of Mr. Matlack was at the time he made the statements. There was no proceeding to which he was a party, nor is the present proceeding against him or his estate. The declarations are purely narrative; they do not charge himself or his estate; on the contrary, they rather seek to impose responsibility by innuendo on the bank or on the insurance company. For this purpose they are inadmissible. It would be difficult to determine whether by these declarations he was seeking to aid his wife in a possible future effort to set aside the transaction impliedly criticised, or whether he was narrating a mere episode in the manner of making the transfer. To render them admissible it must clearly appear that they were at variance with his interest. As this does not appear, or, at best, is but doubtful, the master sustains the objection and rejects the evidence.

4. This brings us to the main question in the cause,—Was the complainant wrongfully deprived of her property? Was

the act of the company in lapsing the policy, and issuing a substituted one therefor, under the facts as found, a fraud upon her.   There can be no doubt that the policy as issued on April 18, 1862, belonged to Mrs. Matlack.   It was her property. An irrevocable trust in her favor had been created.   It is "a general rule that a policy, and the money to become due under it, belong, the moment it is issued, to the person or persons named in it as the beneficiary or beneficiaries, and that there is no power in the person procuring the insurance by any act of his, by deed or by will, to transfer to any other person the interest of the person named."   This is the language of Chief Justice FULLER in the case of Washington Central Bank v. Hume, 128 U. S. 195.   It is fully sustained by authority: Bliss on Life Insurance, 2d ed. sec. 319; May on Insurance, 3d ed. sec. 390.   Apart from the general rule, the act of 1858 of New York, printed on the face of the application, and April 15, 1868, of our own state, quoted in McCutcheon's Appeal, 99 Pa. 133, and the rule of the insurance company, defendant in this case, to the effect that policies issued to married women on the lives of their husbands could not be assigned, secured the title of Mrs. Matlack beyond peradventure.   How could she be deprived of it without her consent?   Whether she signed the alleged assignment to the Seventh National Bank under coercion or not, whether the paper was actually delivered or not, whether the insurance company or the bank had notice of the threats of her husband to take his own life or not, matters but little.   The alleged assignment was a void act, it was against the rules of the company, it was against the statute under which the policy was issued, it was in contravention of the rights which the statute sought to guard, and therefore was a nullity.   Besides this, the assignment was never acted on. It was found among the papers of Mr. Matlack; it was never delivered, even though it may have been tendered, to the bank, and hence the master dismisses it from the case as playing no important part   The real question is: could Mrs. Matlack be deprived of her title to the policy—not by an abortive effort at assignment, but by an attempt at lapse for the nonpayment of a premium at a time when there were dividends of reversionary insurance to the credit of the policy, the cash value of which would, if applied on request, have paid the premium thrice over?

A similar question was clearly answered in the decision of the court of appeals of the state of New York in Barry v. Brune, 71 N. Y. Rep. 261, affirming the judgment entered in the same case, 8 Hun, N. Y. 395.   The facts in that case are strikingly like those now under consideration.   A married woman, under the influence and coercion of her husband, assigned to the defendant, Brune, two policies of insurance, issued to her on the life of her husband, to secure a debt due from him to the defendant.   The latter, fearing that the assignment was invalid under the laws of the state of New York, in pursuance of an arrangement with the company allowed the policies to be forfeited for nonpayment of premiums, and received new policies from the company for his benefit as a creditor for the same amounts, bearing the same numbers, referring to the same register in the company's books, and for the same premiums, except that the latter were payable semiannually instead of annually, such policies being issued upon the original applications and without a new examination.   It was held that the new policies were to be considered as renewals of the old ones, and subject to a trust in favor of the plaintiff the same as was impressed upon the original ones.   After reciting the facts, Judge DANIELS says : " It is entirely clear from these facts that no substantial change was made in the insurance by what transpired.   The new policies were a substitute for those previously issued, a continuation, in fact, of the same insurance, but in the name and for the declared benefit of the defendant, Brune.   They were designed simply to secure him the same advantage expected to have been derived from the assignment alone, and which would have resulted from it, if that had been a valid and binding instrument.   It was not intended to create a new insurance, but simply to render that previously made effectual and irrevocable in the hands of the defendant, Brune.   That is very apparent from the circumstances already mentioned, and from the facts that no increase or change was made in the amount of the insurance or of the premiums to be paid for it. . . . . It was done to render the insurance a valid security in the hands of the defendant, Brune, which it was supposed the assignment alone had failed to accomplish.   That was the nature of the understanding entered into with the agent of the insurance company, and its performance was consummated, as far as

that was practicable, by the forfeiture of the old and the delivery of the new policies. They made the same insurance, with the simple change, that from that time it stood in Brune's name instead of being held by him as assignee, and it was supported by the identical interest in the life of the debtor, Barry, that the assignment was made to protect. . . . Her (the wife's) policies were the moving or inducing cause of those issued to the defendant, Brune. If they had not been, there is good reason for believing that a new application and examination would have been required, together with an increased premium for the additional age of Mr. Barry at the time. But instead of being an independent transaction, the two policies finally issued proceeded from and depended upon the others in such a manner as to form a mere continuation of the same insurance."

The judge placed the plaintiff's right to recover upon the well-settled principle that the true owner of property cannot be deprived of his or her right to it by changing it into something else, as long as the identity can be ascertained and traced. He pointed out that the principle had been frequently applied to the protection of the rights of the assured in cases in which one policy had been surrendered and another received in its place, on the basis of the original insurance. The case was carried up on appeal and affirmed. Judge EARL tersely declared: "It is clear that the old policies were the consideration of and the inducement to the new policies. The new policies could not have been obtained but for the possession and surrender by Brune of the old policies, and the premiums upon the new policies were paid in part by a cash dividend due upon one of the old policies. Brune thus, by means of possession of the old policies which belonged to the plaintiff, and by using and surrendering them, obtained the new policies. The real substance of the transaction was a substitution of the new policies for the old, for the purpose of getting the security which the old did not give him. Under the circumstances of this case, both upon reason and authority, the substituted policies, in equity, simply take the place of the old policies, and the money payable thereon must go to the party entitled under the old policies. For this conclusion there is abundant reason and authority."

It would be difficult to find a case more like the present one,

and the clearness and directness of the reasoning quoted renders further citation of authority unnecessary. It is sufficient to say that the case has been confirmed in 86 N. Y. Rep. 11, in the case of Brummer v. Cohn (1881) and in Baron v. Brummer, 100 N. Y. Rep. 372 (1885). The case of Chapin v. Fellowes, 36 Conn. 132 (1869), is also expressly in point. So, too, is our own case of McCutcheon's Appeal, 99 Pa. 133. In that case A had taken out a policy of insurance on his own life, payable to his wife, and, becoming subsequently indebted to various parties, induced her by fraud and coercion to assign the policy to B as collateral security for an antecedent debt due by A to B. B was ignorant of the fraud and coercion and paid several premiums on the policy. On the death of A in a contest between the widow and B for the amount of the policy, it was held that B was not to be regarded as an innocent holder for value, and was, therefore, only entitled to a return of the premiums paid by him with interest thereon, and that the widow of A was entitled to the fund.

The case now under consideration is on all fours with those just discussed. Mrs. Matlack was the owner of policy No. 26,717, on which the premiums had been paid up to April 18, 1869, to the credit of which there was of reversionary insurance a sum which, if taken at its cash value and applied to the payment of the premiums on April 18, 1869, would have been sufficient to have paid it thrice over. An assignment was extorted from her by her husband. It failed of its effect, clearly because it was illegal. Whether the bank or insurance company had knowledge of the husband's violence and threats is of no concern here. The assignment could not be used, and was not used. What followed? The premium which was due on April 18, 1869, was not paid. The default was wilful. Mr. Matlack knew when the premium was due, had been expressly notified by the bank that it was due, and wilfully defaulted. The policy was surrendered to the company, and marked with the words "To own favor, having lapsed April 22, 1869." Within four days a new policy was issued in precisely the same form, except that the loss was made payable to the assured, his executors, administrators, or assigns, instead of to his wife; bearing the same number, on the same life, for the same premium, maturing at the same periods. All this was done with-

out any new application for insurance, and without any medical examination or any increase in premium, although the insured was seven years older and the risk had increased.

It is interesting to note the dates of the successive steps. The premium on the original policy was due April 18. It was lapsed on April 22. The new policy was issued April 22; it was assigned to the Seventh National Bank on April 24; the transfer was noted at the office of the company on the same day, but it was not until April 26 that the premium was paid on the new policy and accepted by the insurance company's agent in the shape of a check from the cashier of the Seventh National Bank. In other words, although the insurance company had undertaken to lapse, with all its dividend accumulations, one policy for nonpayment of premium on the very day on which it was due, it also undertook to issue a substituted policy and to deliver it and recognize an assignment of it before any premium had been paid, and on which the premium in point of fact was not paid until eight days after the alleged lapse of the old policy, and four days after the issue of the new policy. Subsequently the premiums due on this new policy were paid by the application of the dividends credited to the old policy. It is clear—nothing can be clearer—that the new policy was a mere substitute for the old policy; that in equity it is the same policy. As the original policy was stamped with a trust in favor of the plaintiff, the new policy is stamped with a similar trust. It was purchased with Mrs. Matlack's policy; her policy was the consideration for the issue of the new one; her reversionary dividends were used to pay the premiums on the new policy. A tortious conversion, unknown and unacquiesced in, entirely without consideration, and a mere subterfuge to effect a change in the name of a beneficiary, cannot be permitted to operate as a discharge of a contract or as the destruction of a trust.

It was argued by able counsel that it was permissible for the company to declare that the policy had lapsed for the nonpayment of a premium on the day on which it was due, and that while the dividends of the company might be used, at the option of policy holders, either to purchase additional insurance payable with the policy at maturity, or as cash in the payment of premiums, yet it was necessary for the policy holder to give

instructions in writing as to his or her option in application of the payments. As to the first half of the contention, it may be admitted that a lapse can be declared for the nonpayment of a premium. But it must be an actual and not a sham lapse. The rights of the policy holder must be cut up and destroyed entirely; not a vestige of interest should remain. If he desires another policy he should be called upon to make a new application, to undergo another medical examination, to pay an increased premium according to his increased age; and, above all, he should not be permitted to direct or control the direction of the proceeds of the lapse. The very indorsement on the face of the original policy in this case negatives the idea of a lapse. The words, " To own favor, having lapsed," are self repugnant and contradictory, and, taken in connection with all the surrounding facts which have been detailed, fully persuade the master that no real lapse was intended, but that it was a mere device to evade the nonassignable features of Mrs. Matlack's policy. As to the second half of the contention, the case is ruled by that of the Girard Life Insurance Company v. The Mutual Life Insurance Company, 97 Pa. 15. It was there held that no forfeiture of a policy can be sustained for nonpayment of premiums when the company has in its possession money belonging to the assured sufficient to pay them. The true point, observed Justice PAXSON, " is the power of the company to make the application, and the right to set off the premium against a suit for the dividends. . . . As a matter of fact, the consent of the assured to the appropriation may be presumed. That he would object to it, and thereby forfeit his policy, is a proposition too absurd to be seriously considered." This was held to be particularly true if the assured were in the habit of applying his dividends to the payment of premiums. In the case now before the master the proof was to the effect that for nearly two years, immediately preceding the day of alleged lapse, the dividends had been so applied.

On the whole case, the master is of the opinion that the acts of the insurance company in lapsing the original policy do not bind Mrs. Matlack, and that the substituted policy No. 26,717 was impressed with a trust in her favor, as much so as if her name had been mentioned therein as beneficiary, and that that policy being in force at the time of the death of her husband

constitutes a valid claim in her behalf for its face value and whatever additional assurance properly belonged to it.

5. Was the bank a party to the wrong? The master cannot find any evidence of knowledge on the part of the Seventh National Bank of the manner in which Mrs. Matlack's signature was obtained to the assignment, nor can he find that the assignment was ever delivered. It would be entering the realm of speculation to assume that it had been tendered, but rejected, although some persuasive reasons were stated in support of this theory. Dealing with the facts as they exist, the master finds that the bank had full knowledge of the existence of Mrs. Matlack's policy, and had notice of her rights. The letter of the cashier, dated April 14, 1869, addressed to Mr. Matlack, is as follows: " The insurance policy matter is to be arranged on or before the 18th inst. Please call at the bank in time to complete the arrangement." The " 18th inst." referred to is the day on which the premium on Mrs. Matlack's policy matured. Again the cashier wrote three days later: " The premium on policy is due to-day. Call at the bank on Monday by 10 A. M. without fail, so that the matter can be arranged according to agreement." The policy referred to was Mrs. Matlack's policy. There was none other to which the language and dates would fit. Besides these letters, which are in themselves satisfactory proof of knowledge, there is indorsed on the substituted policy held by the bank under assignment, words which constitute express notice: " Premiums on former policy, same number, paid in full to April 18, 1869." The bank took the policy, with knowledge of Mrs. Matlack's rights, as collateral security for an antecedent debt. The discount of the note for $1,278.85 occurred on January 27, 1869, and the discount of the $500 note was on the 19th of February. The assignment of the substituted policy was on April 24, 1869. The bank being a mere pledgee, with notice of pre-existing equities, cannot be regarded as a holder for value: Goodwin v. Massachusetts Loan, etc., Company, 152 Mass. 190 ; Ashton's App., 73 Pa. 153. The bank having received the substituted policy with full notice of all pre-existing facts relating to the ownership and character of the original policy, and having used the accumulated dividends to which the original policy was entitled, in part payment of premiums maturing under the substituted policy, accepted nec-

essarily the new policy burdened with a distinct trust in favor of Mrs. Matlack, which was indestructible so far as any act of theirs was concerned.

Is there, however, an equitable claim to reimbursement for the sums actually paid in cash by the bank to keep the policy alive ? Under the decision of the court in McCutcheon's Appeal, 99 Pa. 133, it would seem that the bank is entitled to a return of the premiums paid, and that Mrs. Matlack is entitled to receive the amount of the policy less the premiums actually paid in cash in order to keep the policy alive.

It must be borne in mind that the bank had no knowledge of the means resorted to by Mr. Matlack to secure the possession of the policy, nor of the coercion used to obtain the assignment of the policy signed by Mrs. Matlack. The theory upon which the case properly rests is that the substituted policy was impressed with a trust in favor of Mrs. Matlack precisely similar in its character to the trust impressed upon the original policy; and hence when the substituted policy passed into the hands of the bank, which had knowledge of Mrs. Matlack's ownership, as has been found, it passed, of course, under and subject to her rights, and this view is still further strengthened by the fact that the bank had taken the policy as collateral security for an antecedent debt. In order, however, to preserve her rights, had Mr. Matlack defaulted in the payment of the premiums, Mrs. Matlack would have been obliged to make payment herself; and as the bank actually advanced in cash the sum of $1,574.54, it would seem but equitable that it should be allowed a credit for this sum. In McCutcheon's Appeal, Justice GREEN in speaking of the position of Wilson, who had taken a policy of life insurance as security for a debt due by the husband, used this language : " He merely took the assignment as collateral security for a pre-existing debt or liability. He paid the maturing premiums voluntarily, and is, of course, entitled to have them returned with interest from the time of their payment." Adopting this view of the case, the master is of the opinion that substantial equity is worked out between all the parties if they are placed, as far as possible, in their original position. The policy held by the bank as a subsisting trust in favor of Mrs. Matlack has been paid by the insurance company precisely as if there had been no attempt at lapse or substitution, and pre-

cisely as if the original policy had remained alive until the time
of Mr. Matlack's death.   The bank, accepting that policy,
impressed as it was with a trust in Mrs. Matlack's favor, as col-
lateral security for an antecedent debt due by her husband, can-
not withhold payment of the proceeds from Mrs. Matlack, but
must account to her as a trustee for moneys received for her
account.   By restoring to her the sum which it received from
the insurance company it is simply surrendering the collateral
which it took burdened with a trust, and the only loss which
it is subjected to is that of the amount of the notes which it
discounted prior to the time of receiving the policy, and which
were discounted on the faith of Mr. Matlack's individual credit.
The bank, therefore, loses nothing more than its original debt,
growing out of an incautious credit.   In this there is no hard-
ship.   But the bank should not be called upon to pay for Mrs.
Matlack's benefit sums of money to keep alive a policy for her,
nor should she be permitted to reap the benefit of the expendit-
ures made by the bank on her account.   It therefore seems
equitable to the master that she should allow a credit for these
cash premiums, and a decree is reported by the master in accord-
ance with these views.

It is proper to observe, in order that full justice may be done,
and that no misapprehension as to the conduct of individuals
may arise, that none of the present officers of the Seventh
National Bank, nor the present agent of the Mutual Life Insur-
ance Company of New York, had anything to do with the trans-
actions discussed in this report.   They were not then in their
present official positions, and are personally unacquainted with
the facts.

On exceptions the master reported as follows :

The 1st exception of the plaintiff and the 4th, 5th, and 6th
exceptions of the defendant bank may be considered together.
It was earnestly contended that the only items of evidence to
charge the defendant bank with knowledge of the plaintiff's
rights under the policy dated April 18, 1862, consisted of the
deposit book of George G. D. Matlack with the said bank, and
that as the said book had never been left with the bank for
settlement, and that as no bank clerk, officer, or employee had
made entries or writings in the book relating to the policy, and
had no knowledge of the historical narrative written therein by

the husband of the plaintiff, the bank could not be charged with
knowledge on this ground.   This contention would be admissi-
ble were there no other evidence in the case than that alluded
to.   In reaching the finding of fact that the bank had knowledge
of the plaintiff's rights, the master expressly excluded the writ-
ten statements made by Mr. Matlack in his bank deposit book.
The reasons for this ruling are stated under the third subdivision
of the opinion of the master upon the law as applied to the facts
as found.   This exclusion was made the subject of an exception
by the plaintiff, and the master sees no reason for changing his
views.   The real and substantial evidence of knowledge on the
part of the bank is contained in the letters of the cashier of the
bank to Mr. Matlack dated April 14, 1869, and April 17, 1869,
and in the indorsement on the substituted policy, held by the
bank.   It is difficult to conceive what clearer evidence of knowl-
edge on the part of the bank could be presented.   The cashier,
the bank's own officer, writes to Mr. Matlack as follows, April 14,
1869 : " The insurance policy matter is to be arranged on or
before the 18th inst.   Please call at the bank in time to com-
plete the arrangement."   What insurance policy?   Clearly the
policy owned by Mrs. Matlack, for there was no other policy to
which reference could be made.   The paid-up policy for a small
amount could not have been the one referred to, for, as a paid-
up policy, it was beyond the reach of an " arrangement."   Why
is the 18th inst. fixed as the date " on or before " which the
arrangement was to be made ?   Clearly, because it was the day
on which the premium on Mrs. Matlack's policy fell due.   There
was no other policy to which this date could be referred.   This
conclusion is sustained by the second letter of the cashier,
written three days later, in which he says : " The premium on
policy falls due to-day.   Call at the bank on Monday by 10 A. M.
without fail, so that the matter can be arranged according to
agreement."   The 18th inst. in 1869, fell on Sunday, hence the
words " due to-day," written on the 17th inst.   Clearly, this
refers to the only policy then in existence, and the language
points to an existing policy and to an agreement already reached,
made, undoubtedly, in pursuance of the request contained in
the letter of the 14th inst.   The conclusion is clinched by the
indorsement on the substituted policy, which was as follows:
" Premiums on former policy, same number, paid in full to

April 18, 1869." This substituted policy passed into the pos-
session of the bank. The indorsement stared the bank officers
in the face. It pointed directly to the former policy, which
was Mrs. Matlack's property, and it gave the number of the
policy, and the due date of the premium as additional and
unequivocal features of identification. The three papers taken
together,—two of them written by the cashier and the third left
in the possession of the bank,—are capable of but one consistent
and rational interpretation. They constitute an unbroken chain
of circumstantial evidence, each link of which is strong and
exactly fits its fellow. Besides all this, the bank used the
reversionary dividends on the lapsed policy to keep the substi-
tuted policy alive, and in doing this used the plaintiff's money.
The master is more than ever convinced of the correctness of
his finding of fact that the bank had full knowledge of the  .
plaintiff's rights, and declines to alter it. Directly in this con-
nection, occurs the plaintiff's first exception, to the effect that
the master had erred in allowing to the bank out of the pro-
ceeds of the policy the amount of money expended by it on
account of payment of premiums maturing on said policy from
April 18, 1869, to January 18, 1893. This ruling was based
upon the view originally taken by the master of McCutcheon's
Appeal, 99 Pa. 135. This case was critically examined by
counsel in their argument of the exception, and has been care-
fully examined by the master since the argument. He is now
of the opinion that it is not a controlling authority upon the
point involved, and that the exception should be sustained.
The real point involved in that case was whether McCutcheon,
at a time when he was insolvent, could take out a policy on his
own life in favor of his wife. The master in that case had
inferred fraud against creditors from the fact of insolvency.
This view was reversed. The creditor, who had paid in good
faith and without knowledge of any fraud upon the wife the
premiums on the policy, was awarded by the Supreme Court
the amount of the premiums so paid. The question, however,
as to his right to such reimbursement was not raised in the
argument nor in the report of the master, and hence what the
court said upon that head must be regarded as an obiter dictum.

The question now before the present master is, whether a
party who not only was fully cognizant of the fraud, but who

actively participated in it, is entitled to reimbursement. The bank, after having incited Matlack to perpetrate a fraud on his wife by urging him to complete the arrangement—as appears clearly from the letters of its cashier—now seeks to derive a direct benefit from the fraud by protecting an antecedent debt, secured by collateral fraudulently obtained, to the extent of the payment of premiums voluntarily made with a full knowledge of the plaintiff's rights. Can this be done? The answer must be stated in the language of AGNEW, J., in Bleakley's Appeal, 66 Pa. 187. There A had bought land by articles and paid part of the purchase money. B entered a judgment against him, and afterward A assigned the articles to C, antedating the assignment to precede B's judgment and to defraud B. C paid the balance of the purchase money. B bought A's title under his judgment, and it was held that he was entitled to specific performance from the vendor without repaying C. "On what pretense," said AGNEW, J., "in foro conscientiæ, can a party attempting to carry out a scheme of fraud against another, by a payment, claim compensation of the party he has attempted to defraud? Conscience and benevolence revolt at such an iniquity. . . . . As to Lamberton, the payment by Bleakley was not only fraudulent and intended to displace his judgment, but it was also voluntary. It was not paid at Lamberton's request, nor for his use and benefit, but, on the contrary, was intended to defeat his right as a creditor by overlapping his judgment by means of the covinous transfer. . . . . He cannot, thus standing before a chancellor, ask him to make repayment to him a condition to a decree to remove the fraudulent obstruction he threw in the way. The payment is one of the very steps he took to consummate the fraud upon Lamberton. . . . . And in addition to all this, it is a rule that a chancellor will not assist a party to obtain any benefit arising from a fraud. He must come into a court of equity with clean hands. It would be a singular exercise of equity which would assist a party, who had paid money to enable him to perpetrate a fraud, to recover his money just when the chancellor was engaged in thrusting out of the way of his doing equity to the injured party the very instrument of the fraud. He who does iniquity shall not have equity: Hershey v. Weiting, 50 Pa. 244." This maxim and its application have been twice approved by the

Supreme Court in the recent cases of Title & Trust Co. v. Shallcross, 147 Pa. 485, and Mortland v. Mortland, 151 Pa. 593. The language quoted is pertinent to the case in hand. The payments made by the bank were purely voluntary; they were made with a full knowledge of the plaintiff's rights; they were not made at her request; they were not intended for her use or benefit, but were the means by which the fraud upon her was to be consummated. They were made with the intent to defeat her right, and for the purpose of establishing the title of the defendant bank to the very policy which had been wrongfully, and by a most censurable device, substituted for that which was hers, and which was specifically referred to by number and date by the substituted policy itself. The obstruction to the plaintiff's recovery is the result of the defendant bank's participation in a plot against her entered into with her husband. The payments were made to maintain this obstruction. In thrusting aside this obstruction, what equity can there be on the part of the bank to a repayment of the very sums paid for the express purpose of defeating her right? How can repayment be made the condition of a decree which seeks to set aside the result of a fraud, fostered and sustained by the very sums of money now claimed by one of the active participants in the fraud? To ask the question is to answer it. The distinction between McCutcheon's Appeal and the present case is clear. It did not so appear upon the first argument, but the master, aided by the searching discussion had since then, perceives plainly the distinction. In the former, the party seeking to recover was innocent and clean handed. In this case it is not so.

That no injustice may be done to any one, the master repeats that none of the present officers of the Seventh National Bank nor the present agent of the Mutual Life Insurance Company of New York had anything to do with the fraudulent scheme discussed herein, nor had they any knowledge of it.

The master is of opinion, and so reports to the court, that in his judgment the allowance previously made to the bank should be set aside, and that there should be a decree in favor of the plaintiff for the full amount of the policy paid by the Insurance Company to the defendant bank, with interest from the time of payment.

The court entered a decree awarding the full amount of the policy, $5,036 to plaintiff. Defendants appealed.

*Error assigned* was decree of the court.

*David W. Sellers,* for appellant, the Seventh National Bank.
—The plaintiff was an incompetent witness: Bitner v. Boone,
128 Pa. 567; Act of May 23, 1887, P. L. 159; Cornelius v.
Hambay, 150 Pa. 359; Johnson v. Watson, 157 Pa. 454.

The master erred in holding that the policy held by this
appellant was substitutionary of any other.

The court erred in holding that this appellant had knowledge
of the rights of the plaintiff to and under the policy issued in
1862.

The court erred in the inference that the note of the cashier
of April 14, 1869, had any reference to any policy held by plain-
tiff.

The master should have found that the exceptant as a creditor
became the holder of the policy on which it received the money
for its own use: Robinett's App., 36 Pa. 174; Baker's App.,
120 Pa. 33; McCutcheon's App., 99 Pa. 133.

The bank has lost its debt—it has been denied the money
paid by it in maintaining its policy; and these forfeitures being
insufficient, it has been further punished for keeping the policy
alive by costs: Jones v. Wadsworth, 11 Phila. 239; Northern
Cent. Ry. Co.'s App., 103 Pa. 624; Penna. R. Co.'s App., 116
Pa. 76; Barry v. Brune, 8 Hun, 395; Goodwin v. Loan Co.,
152 Mass. 190; Chapin v. Fellowes, 36 Conn. 132.

*Charles P. Sherman,* for appellant, the Mutual Life Insur-
ance Company of New York.—Where an action is brought
against more that one for a wrong done, in order to recover
against all, a combination or joint act of all must be proved:
Laverty v. Vanarsdale, 65 Pa. 507.

The court below was not justified in decreeing that the insur-
ance company is jointly liable with the bank to the plaintiff:
Kennedy v. McCloskey, 170 Pa. 354.

The policy of 1869, assigned to the bank, was not substituted
for the policy of 1862, the policy in suit, but was a new policy.

*Francis J. Alison,* for appellee.—The statute of limitations
is no bar, by analogy in equity, to the plaintiff's claim because of
coverture: Etter v. Greenawalt, 98 Pa. 431; Wood on Lim-

itations (2d ed. 1893), 240; Dwarris on Statutes, 154; McCool v. Smith, 1 Black. 459; Jones v. Conoway, 4 Yeates, 109; Rush v. Barr, 1 Watts, 110; Marsteller v. Marsteller, 93 Pa. 350; Winters v. De Turk, 133 Pa. 359; Lord Montford v. Lord Cadogan, 19 Ves. 635; Lench v. Lench, 10 Ves. 511; Blandford v. Marlborough, 2 Atk. 542; Black v. Whitall, 9 N. J. Eq. 572; Roche v. O'Brien, 1 B. & B. 339; Campbell v. Walker, 5 Ves. 678; Lewin on Trusts and Trustees (8th ed. 1888), p. 496; Stewart's Case, L. R. 1 Ch. App. 514; Burrows v. Walls, 5 De G. M. & G. 233; Mulcahy v. Kennedy, 1 Ridgw. P. C. 337; Trevelyan v. Charter, 4 L. J. Ch. 214.

The plaintiff, who is discoverte, is competent to testify in her own behalf, the suit being not against her husband's estate, but against strangers, to recover her own property: 3 Bacon's Abr., 7475; 1 Blackstone, 443; Weaver v. Yeager, 64 Pa. 425; Bitner v. Boone, 128 Pa. 567; Daisz's App., 128 Pa. 572; Musser v. Gardner, 66 Pa. 242; Rowley v. McHugh, 66 Pa. 269; Suplee v. Laflin Co., 21 W. N. C. 647; Phillips v. Hall & Carpenter, 160 Pa. 60; Robb's App., 98 Pa. 501; Stephens v. Cotterell, 99 Pa. 188.

The substituted policy No. 26,717, issued to the husband on April 22, 1869, and by him assigned to the Seventh National Bank as collateral security for an antecedent debt of the husband to the bank, is in equity the property of the plaintiff: Law of the State of New York, acts of April 1, 1840, April 14, 1858; Law of the State of Pennsylvania, act of April 15, 1868; 33 and 34 Victoria, c. 93, sec. 10; Barry v. Equitable Life Assurance Society, 59 N. Y. 593; Bliss on Life Ins., 517, 518; Ricker v. Charter Oak Ins. Co., 10 Ins. L. J. 143; Trager v. Louisiana Ins. Co., 9 Ins. L. J. 817; May on Insurance, 866; Central Bank of Washington v. Hume, 128 U. S. 206; Eadie v. Slimmon, 26 N. Y. 9; Barry v. Equitable Life Assurance Society, 59 N. Y. 587; Girard Life Ins. Co. v. Mut. Life Ins. Co. of N. Y., 97 Pa. 26; 2 Story's Equity Jurisprudence, sec. 1258; Story on Agency, sec. 229; Taylor v. Plumer, 3 M. & S. 562; Garrard v. R. R., 29 Pa. 154: Dutton v. Willner, 52 N. Y. 312; Nesbitt v. Berridge, 10 Jurist, N. S. 53; Lemon v. Phoenix Life Ins. Co., 38 Conn. 294; Norwood v. Guerdon, 60 Ill. 253; LeBreton v. Peirce, 2 Allen, 8; Story's Equity, 1268.

The defendant bank was not an innocent holder for value,

and without notice of the plaintiff's preëxisting equity: Boggs
v. Lancaster Bank, 7 W. & S. 331; Walsh v. Stille, 2 Pars. 17;
LeNeve v. LeNeve, Ambler, 436; Ins. Co. v. Whipp, 26 Ch. D.
487; Mitchell v. Lycoming Ins. Co., 51 Pa. 402; Burger v.
Farmers' Mut. Ins. Co., 71 Pa. 422; Goodwin v. Mass. Loan
Co., 152 Mass. 189.

The defendant bank has no lien, claim or right in equity to
reimbursement of moneys expended in part payment of premiums
maturing from time to time on substituted policy No. 26,717:
Breneman's App., 121 Pa. 648; Peebles v. City of Pittsburg,
101 Pa. 304; Hehn v. Hehn, 23 Pa. 415; Inhabitants of So.
Scituate v. Hanover, 9 Gray, 420; Briscoe v. Power, 64 Ills.
72; City v. Hussey, 9 Atl. R. 21; Lockwood v. Bishop, 51
Howard, Pr. N. Y. 221; Meier v. Meier, 15 Missouri App., 68;
Falcke v. Scottish Imperial Ins. Co., 34 Ch. D. 234; Pomeroy's
Equity Jur. (1892,) sec. 1241; Rennie v. Young, 2 DeGex
& J., 136; Ramsden v. Dyson, L. R., 1 H. L. 129; Davidson
v. Barclay, 63 Pa. 406; Dart v. Hercules, 57 Ills. 446; Cannon
v. Copeland, 43 Ala. 252; Leslie v. French, 23 Ch. D. 552
(1883); In re Waugh, 742 L. J. Ch. 629 (1877); Burridge v.
Row, 1 Young & Collyer Ch. 183; Earl of Winchelsea's Policy
Trusts, 39 Ch. D. 168 (1888); Falcke v. Scottish Imperial Ins.
Co., 34 Ch. D. 234 (1886); Norris v. Caledonian Ins. Co. L. R.
8 Eq. 127; Gill v. Downing L. R. 17 Eq. 316; Ruth v. Katter-
man, 112 Pa. 251; Downey v. Hoffer, 110 Pa. 109; Wegman
v. Smith, 16 W. N. C. 186; Bleakley's App., 66 Pa. 191; Schole-
field v. Templer, 1 Johnson, 155; Ex parte Edwards, L. R. 14
Q. B. D. 415; Wharton's Evidence, 226; Sussex Peerage Case,
11 C. & F. 85; Allegheny v. Nelson, 25 Pa. 332; Wharton on
Evidence, 228.

The evidence in this case shows conclusively that there was
a conspiracy or combination between the husband, the defend-
ant bank, and the defendant insurance company, the common
purpose of which was to take the wife's policy as security for
the husband's indebtedness to the bank, in fraud of the rights
of the wife and in contravention of law: Johnson v. The State,
26 N. J. L. 321; U. S. v. Babcock, 3 Cent. L. J. 144; Com. v.
Bartilson, 85 Pa. 489; Com. v. Gillespie, 7 S. & R. 469; Big-
elow on Law of Fraud, 247; Wright & Carson on Law of Crim-
inal Conspiracies and Agreements, 212; McDowell v. Rissell,

37 Pa. 164; McCaskey v. Graff, 23 Pa. 321; Stauffer v. Young, 39 Pa. 455; Yerkes v. Wilson, 81* Pa. 9; Jaggard on Torts, 210; N. P. R. R. Co. v. Mahoney, 57 Pa. 187; Borland v. Meurer, 139 Pa. 513; Desh's App., 42 L. I. 161; Hamilton v. Hamilton, 18 Pa. 20; Bickel's App., 86 Pa. 204; Rennie v. Young, 2 De Gex & J. 136; Taylor v. Plumer, 3 Maule & Selwyn, 575; Barry v. Brune, 71 N. Y. 261.

Costs in equity are largely in the discretion of the court below, and its decree will not be interfered with except for strong reasons : Piper v. St. Paul Trust Co., 140 Pa. 233; Patrick's App., 105 Pa. 356; Daniel's Chancery Prac. 1537.

By way of distinction, joint tort feasors are held responsible, not because of relationship, but because of concerted action to a common end. The person injured by joint tort feasors may sue and recover against all, any number, or only one of them : Merryweather v. Nixan, 8 Term R. 186; R. R. v. Mahoney, 57 Pa. 189; Klauder v. McGrath, 35 Pa. 128; McAvoy v. Wright, 137 Mass. 207; Garrard v. R. R. 29 Pa. 154.

OPINION BY MR. JUSTICE FELL, March 22, 1897 :

We find nothing in the testimony in this case to sustain the conclusion that there was a conspiracy to deprive the plaintiff of the benefit of the insurance on her husband's life, and nothing on which a finding of fraud can rest. All of the persons who in 1869 took part in the transaction now under investigation, except the plaintiff, are dead, and her knowledge of it is limited to the signing of a transfer of the policy. We are left mainly to inference in determining the intentions of the parties and the means employed to carry them out. The transaction in its inception was not an unusual one, and there is nothing in the manner in which it was subsequently carried out to give rise to a suspicion of unfair dealing or of intentional wrong.

If we confine our view to the occurrences of April 18, 1869, when the plaintiff's policy was surrendered and a new policy was issued to her husband and assigned by him to the bank, there is ground for the conclusion of the learned master. This however is only a partial view of the transaction, and a very imperfect one. We should start with the occurrences of February 16, when the assignment from her was procured. On that day the Seventh National Bank held the note of her husband,

George D. G. Matlack, for $1,278.83, dated January 28, 1869, at four months, and he induced her to assign to the bank as collateral a policy of insurance on his life for her benefit, issued by the Mutual Life Insurance Company of New York. The purpose of the assignment was evidently to secure his note held by the bank and to enable him to obtain additional loans. On February 19 the bank discounted for him a note for $500. The entry in his bank book shows that collateral was given with this note. What was done by him and the officers of the bank with reference to the assignment could not be shown, because of the death of all the parties. The policy had been delivered to him by the plaintiff on February 16, and it was afterward with his papers at the bank. The most reasonable supposition, and one entirely consistent with the established facts, is that the bank discounted the last note under the belief that the assignment was valid, and returned the assigned policy to him when it was learned that it was ineffectual to transfer his wife's interest. When the next quarterly premium on the policy fell due, April 18, 1869, it was not paid, and the policy lapsed. A new policy was issued, payable to the executors, administrators or assigns of Matlack, and this policy he assigned to the bank.

The strongest assumption against the defendants which it is possible to draw from the testimony is that the premium due April 18 was left unpaid, with the design that the policy should lapse and a new policy which could be transferred should be issued. We cannot leap from this assumption to the conclusion that a moral wrong was contemplated and an undue advantage taken without ignoring the real intent and purpose of the parties. The plaintiff had already divested herself as effectually as she could of all interest in the policy, and transferred it to the bank to aid her husband in his business affairs, and this arrangement did nothing more than carry out in another form the agreement that the bank was to have the policy as security, to which she had expressly assented by signing the transfer. It was apparently the means adopted after the insurance company had refused to recognize the transfer or it had been found invalid for purely legal reasons, to give effect to the intention of the parties. The bank got only what the plaintiff had agreed that it should have, and the insurance company acted with liberality in doing what it was not required to do, and what it could

have no other motive for doing than to protect the interests of the insured. In looking back at this transaction after twenty-four years it must be remembered that at the time Matlack was bankrupt. He was unable to pay his notes or to pay the premium on his policy, and neither the bank nor the insurance company had the slightest notice of the claim now set up, that the assignment was procured by means of threats and coercion.

When however the plaintiff's policy was forfeited for non-payment of the quarterly payment due April 18, there was to the credit of the policy an amount of reversionary insurance, the cash value of which was more than sufficient to pay the premium then due. This reversionary interest had at her request or that of her husband been applied by the company to the payment of premiums for two years immediately preceding the forfeiture. Under the ruling of this court in Girard Life Ins. Co. v. Mutual Life Ins. Co., 97 Pa. 15, the insurance company could not under the circumstances forfeit the policy, and the forfeiture cannot now be sustained. The assignment, whether valid or not, was not used to divest her interest, and the forfeiture was ineffectual to do so. The second policy bore the same number and was for the same amount and at the same rate of premium as the first, and it was in part purchased by the use of the reversionary insurance that stood to the credit of the first policy. We agree with the learned master that this policy was a substitute for the first policy, and that having been received by the bank with knowledge of that fact it was impressed with a trust in favor of the plaintiff.

Is the bank entitled to credit for the premiums paid? For twenty-four years it paid the premiums and preserved the policy. These premiums were paid in good faith, in reliance on its title, and without notice of the claim that the plaintiff now sets up, that the assignment was improperly procured. During the whole of this time she knew that if the policy was still in force it was by reason of the payments made by the bank, and for six years before her husband's death she knew exactly what had been done in relation to the policy, and why it had been done, and she remained silent. To permit her now to take the whole fund would be grossly inequitable. It is not the case of payment by a volunteer having no claim or color of interest, nor by one who used his money in an attempt to carry out a scheme

of fraud and should be denied repayment of the money so expended. It is the case of payments made in good faith under belief of ownership of the policy as collateral and for the joint benefit of the holder and the beneficiary. The equity of the bank is certainly as clear as was that of the holder of the policy in McCutcheon's Appeal, 99 Pa. 133, who was held to be entitled to a return of the premiums paid by him. In Downey v. Hoffer, 110 Pa. 109, and Ruth v. Katterman, 112 Pa. 251, the holders of wagering policies were allowed to retain the amounts paid by them to keep the policies alive.

We are of opinion that the learned master was correct in his first finding upon this subject, and that the decree recommended in his first report should be entered against both defendants, and that the costs should be borne equally by the plaintiff and the defendants. With this modification the decree is affirmed. And now, March 22, 1897, it is ordered, adjudged and decreed that the Seventh National Bank of Philadelphia do pay to Theodosia Matlack the sum of $5,036 with interest from March 15, 1893, less the sum of $1,574.58 with interest thereon averaged during the periods that this amount was paid by the said Seventh National Bank as premiums; and that the Mutual Life Insurance Company of New York pay to the said Theodosia Matlack a like sum, this decree to be marked satisfied upon the receipt by the plaintiff from either of the parties defendant of the sum herein named, the costs to be paid one half by the plaintiff and one half by the defendants.

MR. JUSTICE MITCHELL dissenting:

The plaintiff was not a competent witness against the bank. The latter represented the title of the husband who was dead and whose interest had passed to the bank. It was moreover a creditor of the husband and held the policy only to secure its debt, and to the extent necessary for that purpose. If any balance remained (as this court holds that there did) it prima facie belonged to the husband's estate and his creditors. By her own evidence the wife is now allowed to take it away from them. If the policy had been on the endowment plan and had become due and payable to the husband in his lifetime it cannot be pretended that the wife would have been a competent witness against him to claim the money, on the ground that the

policy was a substitute for one wrongfully obtained from her. I cannot see how his death makes her any more competent against his estate than she would have been against him. The bank is his assignee for value, and represents his interest, and as against it she is not a competent witness under the plain letter of the statute.

But I would go farther and not only reverse this decree, but dismiss the bill, first for laches, and secondly as to the bank, on the merits. The laches, involving a delay with full knowledge of the facts for twenty-four years, and until all the parties charged as at fault in the original transaction were dead, is too clear to need enlargement upon. As to the merits it is now practically conceded that, on the ground on which the decree was rested by the master and the court below, it cannot be sustained, and the plaintiff has no claim to any part of the money from either defendant. But this court finds that as there were accumulated dividends on the first policy, the cash value of which was sufficient to pay the premium due April 18, 1869, the forfeiture of the policy by the insurance company was unauthorized. Accepting this conclusion as to the insurance company on the authority of the very unsatisfactory case of Girard Co. v. Mutual Co., 97 Pa. 15, there still remains the entire absence of knowledge on the part of the bank of any such reserved dividends, or the other circumstances of the cancelation or forfeiture of the first policy. Of such knowledge there is not a scintilla of evidence. The only facts that the master finds, with any relevancy to this point, are the cashier's letters of April 14 and April 17, 1869, and the indorsement "premiums on former policy, same number, paid in full to April 18, 1869." But the most strained construction cannot make any more out of these than a knowledge on the part of the bank, which is admitted, that there was a policy in favor of Mrs. Matlack, which she had assigned to the bank by a transfer which the insurance company for technical reasons refused to approve, and a subsequent accomplishment of the same result in due form, acceptable to that company. The master finds expressly that the bank had no knowledge of any circumstances of coercion or fraud by her husband against Mrs. Matlack; the first transfer was not used solely because not satisfactory to the insurance company; and when that objection was over-

come and the second policy was issued, the bank took it without either knowledge or notice of the first policy having been improperly forfeited, or of anything irregular in the issue of the second. I am unable to see any ground, in law or equity, on which the bank can be held liable, except for a possible residue after payment of its debt in full with interest, and no such residue is even claimed to exist in the case.

WILLIAMS, J., I agree with my Brother MITCHELL in the views expressed by him, and dissent from the judgment rendered for both the reasons he has given.